# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UTICA ENERGY, LLC, and
NATIONWIDE AGRIBUSINESS
INSURANCE COMPANY,

        Plaintiff,

v.                         Case No. 05-C-1028

TRAVELERS PROPERTY CASUALTY
INSURANCE COMPANY,

        Defendant.

## DECISION AND ORDER

This case involves a dispute over whether damages resulting from the explosion of a recently installed boiler are covered under a Builder's Risk insurance policy issued by Travelers Property Casualty Insurance Company ("Travelers") to Utica Energy, LLC ("Utica"). Utica and Nationwide Agribusiness Insurance Company, Utica's general property and casualty insurer, (collectively referred to as "Utica" since their interests are aligned), brought this action for declaratory relief in the Circuit Court for Winnebago County seeking a determination that Travelers' policy provided primary coverage for the loss. Asserting federal jurisdiction under 28 U.S.C. § 1332, Travelers removed the case to federal court and denied coverage. Travelers now seeks summary judgment on the ground that the undisputed facts establish as a matter of law that its coverage had ceased by the time of the explosion. For the reasons set forth below, Travelers' motion will be denied.

## BACKGROUND

Utica, a limited liability company located in Oshkosh, Wisconsin, is in the business of distilling fuel grade ethanol. (Def. PFOF ¶ 1.) In May of 2004, Utica began an expansion project intended to double the production capacity of its existing plant. The project entailed adding a second boiler and creating a parallel production line to the existing line. (Def. PFOF ¶ 7.)

To insure against the additional risk of property loss or damage that could occur during the expansion, Utica acquired a "builder's risk" insurance policy from Travelers. (Def. PFOF ¶ 20.) Under the terms of the policy, Travelers agreed to pay for loss to property described as "builder's risk." The phrase "builder's risk" was defined to include:

> a. Buildings or structures including temporary structures while being constructed, erected or fabricated at the "job site";
>
> b. Property that will become a permanent part of the buildings or structures at the "job site";
>
> > 1) While in transit to the 'job site' or temporary storage location;
> >
> > 2) While at the 'job site' or at the temporary storage location.

(Woodworth Aff., Ex. G, SPT 000618)

There is no dispute that the additional boiler Utica was installing was intended to become "a permanent part of the buildings or structures at the 'job site,'" and thus would be included under "builder's risk." However, Travelers' policy also includes a termination of coverage provision, which states:

> Coverage will end when any one of the following first occurs:
>
> a. the policy expires or is cancelled;
>
> b. your interest ceases; or

2

> c. unless we specify otherwise in writing and charge additional premium, when any "builders risk" is:
>
> > (a) occupied in whole or in part; or
> >
> > (b) *put into use for other than testing purposes*.

(Woodworth Aff. Ex. G, SPT 000614-15) (emphasis added). It is this last phrase – "put into use for other than testing purposes" – that is at issue here.

At the time of the explosion, the new boiler (Boiler No. 2) had already been installed and was going through the commissioning process. Commissioning a boiler involves both the physical testing of the boiler's functions and the customer's approval that such testing is satisfactorily completed. (*Id*. ¶ 9). Duane Thompson of PBBS Equipment Corporation ("PBBS") was in charge of commissioning the new boiler. (*Id*. ¶ 8.) Thompson began the commissioning process on October 25, 2004, and signed a form indicating his testing was complete on October 31, 2004. (Aff. of Amy J. Woodworth, Ex. A., Dep. of Duane Thompson, 29-32, 96.) Although the parties dispute whether all of the testing called for by the commissioning process was complete at that time, there is no dispute that Thompson had additional work to perform on the boiler, due to the need to replace a gas regulator, and the owner had not yet signed the form indicating his acceptance of the new boiler.

Despite this fact, Boiler No. 2 was the primary boiler operating Utica's facilities from October 31 through November 5. (Def. PFOF ¶ 13.) During this time, Utica's original boiler (Boiler No.1) was shut down due to a leaky gasket. (*Id*. ¶ 12.) On November 5, Thompson returned to Utica to do additional work on Boiler No. 2, but was unable to complete the work because Boiler No. 1 was still down and Boiler No. 2 was needed for production. (*Id*. ¶ 15.) Thompson left the facility at 6:10 p.m., and approximately thirty minutes later, Boiler No. 2 exploded.

3

Based on the foregoing facts, Travelers contends that at the time of the explosion, Boiler No. 2 was being used for other than testing purposes, and thus coverage had ceased under its policy. Utica and Nationwide, on the other hand, contend that because the commissioning process was not yet complete and testing was ongoing, coverage under Travelers' Builder's Risk policy remained in effect.

**ANALYSIS**

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Utica argues that summary judgment cannot be granted in this case because there are numerous disputed facts. (Br. In Opp. at 4.) Of course, the mere existence of some factual dispute does not defeat a summary judgment motion. There must be a genuine issue of material fact for the case to survive. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). And in determining whether a dispute over a material fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

Wisconsin supplies the governing law in this diversity action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In Wisconsin, insurance policies are construed to give effect to the intention of the parties as expressed in the language of the policy. *Folkman v. Quamme*, 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 665 N.W.2d 857. The first step in deciding a coverage dispute is to

4

determine whether an ambiguity exists regarding the disputed coverage issue. *Badger Mut. Ins. Co. v. Schmitz*, 2002 WI 98, ¶ 51, 255 Wis.2d 61, 647 N.W.2d 223. Insurance policy language is ambiguous "if it is susceptible to more than one reasonable interpretation." *Danbeck v. Am. Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis.2d 186, ¶ 10, 629 N.W.2d 150. If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law. *Id.*; *Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis.2d 627, 637, 586 N.W.2d 863 (1998). If there is an ambiguous clause in an insurance policy, it is construed in favor of the insured. *Smith v. Atl. Mut. Ins. Co.*, 155 Wis.2d 808, 811, 456 N.W.2d 597 (1990).

The policy language at issue in this case is not ambiguous. It states that coverage for property included under Travelers' policy will end when the property is "put into use for other than testing purposes." The dispositive issue in the case then is whether Boiler No. 2 had been put into use for some purpose other than testing prior to the explosion on November 5, 2004. And more specifically, for purposes of deciding the motion now before me, the issue is whether the evidence establishes without dispute that the boiler had been put into use for other than testing purposes prior to the explosion.

Travelers argues that there is no dispute that at the time of the explosion, and for several days prior to the explosion, Boiler No. 2 was being used for production, not testing. In support of its argument, Travelers cites Thompson's testimony that he was done with the testing part of the commissioning process on October 31st and that after that time Utica used Boiler No. 2 to run the plant because Boiler No. 1 was down. (Woodworth Aff., Ex. A, Thompson Dep. at 89-90.) Travelers notes that even Utica admits that "it [Boiler No. 2] was also being used to run the plant."

5

(Br. In Opp. at 9.) Based upon Thompson's testimony and Utica's own admissions, Travelers argues that coverage under its policy ceased prior to the explosion.

Utica argues, however, that the fact that Boiler No. 2 was being used to run the plant does not mean that it was "put into use for other that testing purposes." The two are "not mutually exclusive," it contends. (Br. In Opp. at 9.) Utica claims it was simply taking advantage of the steam production that was a by-product of the testing for which the boiler was put into use. Its use of the steam for production purposes, Utica argues, does not change the fact that the boiler had still not been put into use for other than testing purposes. Implicit in Utica's argument is the distinction between the boiler being "put into use for other than testing purposes," which is the language of the policy, and the boiler *being used* for other than testing purposes. Utica argues that, while the boiler may have been used to run the plant, this does not mean it was put into use for other than testing purposes. Utica also likens the commissioning process for a boiler to Navy sea trials where a new ship is taken out and put through its paces. (Br. In Opp. at 2.) Just like the ship at sea, the fact that the boiler is performing its intended function does not mean that it has been put to use for other than testing purposes.

In support of its contention that a factual dispute exists as to whether Boiler No. 2 had been put into use for purposes other than testing prior to the explosion, Utica has submitted the affidavit of Robert A. Mann, a manager working in maintenance, utilities and CO2 operations and the Utica employee most involved with the commissioning process. (Aff. of Robert A. Mann, ¶¶ 2, 3.) According to Mann, Utica began to make productive use of the steam generated during the commissioning process of Boiler No. 2 on or about October 31, but Utica's use of the steam was not the purpose for which the boiler was being run at that time, nor did it affect the commissioning process. (*Id.* at ¶ 7.) Mann states that "[a]t the time of the explosion on November 5, 2004, the

6

commissioning process was ongoing and Boiler No. 2 was still being run for that purpose." (*Id.* at ¶ 8.)

## CONCLUSION

I conclude from the foregoing that a material issue of fact exists as to whether Boiler No. 2 had been "put into use for other than testing purposes" prior to the explosion on November 5, 2004. According to Thompson, testing of Boiler No. 2 was complete on October 31, and continued use of it after that date was for production purposes only. If true, the coverage under Travelers' policy ceased as of October 31. Mann, on the other hand, claims that the continued running of the boiler after October 31 was for testing purposes and Utica was simply taking advantage of the steam that was produced to run its facility while its other boiler was down. If Mann is believed, then coverage under Travelers' policy was still in force. This dispute cannot be resolved on summary judgment. Accordingly, Travelers' motion is denied, and the clerk is directed to set this matter on the court's calendar for trial. Since neither party has requested a jury, trial will be to the court.

**SO ORDERED** this   19th   day of October, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge